IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CURTIS WOOD                   :          CIVIL ACTION
                              :
       v.                     :
                              :
CITY OF LANCASTER, et al.     :          NO. 06-3033

_____ MEMORANDUM

Dalzell, J.                              January 13, 2009

        Plaintiff Curtis Wood, administrator of the estate of

Devon Lee Reid, sued the City of Lancaster, Pennsylvania, certain

of its police officers, Lancaster County, and certain of its

prison officials and personnel for their alleged involvement in

Reid's death on September 17, 2004 while in Lancaster County

Prison ("LCP").  Wood later voluntarily dismissed his claims

against the City of Lancaster and its police officers.

        We have already granted summary judgment in favor of

defendants Darlene Cauler and Elizabeth Haddox, two nurses at

LCP.  The remaining defendants are Lancaster County, Warden

Vincent Guarini, Corrections Officer James Flaherty, Mental

Health Counselor Troy Waltz (together the "County defendants"),

Dr. Robert Doe, who was the prison medical director in 2004, and

Dr. Stephen Powers, who was the prison psychiatrist in 2004.

        Wood asserts violations of the Americans with

Disabilities Act ("ADA") and state law wrongful death claims

against all the remaining defendants.  He asserts Eighth and
Fourteenth Amendment deliberate indifference claims pursuant to
42 U.S.C. § 1983 against Dr. Doe, Dr. Powers, Waltz, and
Flaherty.  Wood also asserts a Monell claim against Lancaster
County and Warden Guarini, as the decision-maker for the prison,
as well as a supervisory liability claim against Warden Guarini.
All defendants have moved for summary judgment on each claim
against them.  We resolve those motions now.

## I.   **Factual Background**

        We will first describe certain LCP policies,
procedures, departments, and personnel to place the events from
July 16, 2004 to September 17, 2004 in context.  We will then at
length detail the events culminating in the death of Devon Lee
Reid, and finally consider the plaintiff's expert medical reports
and Dr. Doe's explanation of his service to his late patient.

### A.   **Lancaster County Prison**

        LCP's medical and mental health policies, procedures,
and personnel play a significant role in this case.  We shall
first describe Warden Guarini's role in establishing LCP's mental
health policies and procedures.  We will next present the roles
that Dr. Doe and Dr. Powers respectively played in the hospital,

and what administrative and diagnostic procedures they used.  We shall then view LCP's mental health policies and procedures in effect when Reid was incarcerated there.

### 1.   **Warden Guarini**

Warden Guarini was the chief executive of LCP.  Pl.'s Mem. Ex. N [Guarini Dep.] at 5.  He had a hand in most LCP policy.  Id.  Warden Guarini formulated LCP mental health and medical policy in consultation with the prison medical director. Id.  His role was to work out the security implications and concerns attendant to implementing an overall medical policy. Id.  Medical staff made all medical and mental health decisions, and other than those medical staff administratively reporting to Warden Guarini, he did not exercise any specific oversight of the medical staff or of their decisions.  Id. at 6-7.

### 2.   **Doctors Doe and Powers**

Dr. Robert Doe and Dr. Stephen Powers, respectively the prison's medical director and psychiatrist, were independent contractors.  Doe Mem. Ex. 2 [Doe Dep.] at 10; Powers Mem. Ex. C [Powers Dep.] at 33.

Dr. Doe supervised the medical department and was responsible for medical decisions and signing off on the actions

of nurses and mental health counselors.  Doe Dep. at 21.  In
particular, Dr. Doe had to sign off on any additions to an
inmate-patient's charts, any drug prescriptions, and any changes
to Suicide Status.  Id. at 84-85.  When an inmate complained
about a medical issue, a nurse would initially evaluate the
inmate and either treat him or put him on a schedule to see the
doctor.  Id. at 35.  Dr. Doe would only examine an inmate if a
nurse referred that inmate to him.  Id. at 35.

Although Dr. Doe was the medical director of the
prison, he did not have significant oversight over how Dr. Powers
treated patients.  Dr. Doe would review some cases with Dr.
Powers, but this was primarily for the purpose of his own
edification rather than as a means of supervising Dr. Powers.
Powers Dep. at 37-38.  In general, Dr. Doe deferred to the
psychiatrists and mental health counselors on most mental health
decisions.  Doe Dep. at 31-32

Dr. Powers spent two half-days each week at the prison
seeing inmates.  Powers Dep. at 34.  Dr. Powers only saw patients
referred to him by mental health counselors.  Id. at 36.  He
relied on the prison personnel to provide him with information
about an inmate's problematic behavior.  Id. at 40.  It was also
understood that the counselors and corrections officers would

4

update Dr. Powers about changes in, or worsening of, a particular inmate's behavior. <u>Id.</u> at 40-41. Although Dr. Powers relied on the counselors and corrections officers to bring him patients and news about the changes in their behavior, he did not rely on their assessments of the inmates' behavior when making his diagnoses. <u>Id.</u> at 69-70.

### 3. <u>Mental Health Status Policy and Procedure</u>

LCP had four official levels of suicide status and mental health status. Pl.'s Mem. Ex. D at 1020-21. LCP placed an inmate on Suicide Status I if the inmate stated that he or she planned suicide and would act on it. <u>Id.</u> at 1020. When on this status, corrections officers were required to make random checks to personally observe the inmate every fifteen minutes. <u>Id.</u> LCP would place an inmate on Suicide Status II if that inmate "expresse[d] hopelessness, but has no current plan on how they would harm themselves." <u>Id.</u> Again, when an inmate was placed on this status, corrections officers must make random fifteen minute checks. <u>Id.</u> If an inmate was placed on either Suicide Status I or II, they had to be housed in a cell with a camera. <u>Id.</u>

Mental Health Status Levels III and IV were not suicide watch status. <u>Id.</u> at 1021. LCP used these Levels to observe

5

inmates who "exhibit[ed] signs of mental health concerns [through] his thoughts or actions" or the "individual need[ed] to be observed, so a further determination can be made concerning individual['s] mental status." Id. at 1021.  These two Levels constituted Medical Observation Status, and only required corrections officers to make random checks every thirty minutes. Id.  LCP did not require inmates on these mental health status levels to be housed in a camera cell.

After making the decision to put an inmate on Suicide Status or Medical Observation Status, medical staff would have an inmate on such status transferred to the Medical Housing Unit ("MHU").  Id. at 1022.  Medical staff then submitted an unusual activity report, assessed the patient's clinical conditions and mental status, and notified the medical director to get a verbal order for the level of Suicide Status.  Id.  Medical staff were to review the mental health status of inmates in the MHU at least every twenty-four hours.  Id. at 1025-31.  During their fifteen and thirty minute random checks on inmates in the MHU, corrections officers were to speak to the inmate and see if he or she responded.  Doe Dep. at 71; Guarini Dep. at 22.  If they were nonresponsive, the officer was to call a code that would bring down nurses and other medical staff on duty.  Doe Dep. at 71-72.

6

According to the official procedures, the decision to put an inmate on, or take him off, Suicide Status was to be a "medical staff decision" about which the prison physician had the final say.  Pl.'s Mem. Ex. D at 1022, 1025-31.  During Reid's incarceration at LCP, the prison physician in question was Dr. Doe.  Doe Dep. at 31. But other medical staff, i.e., nurses and mental health counselors, could take "precautionary measures" when the prison physician was not available.  Pl.'s Mem. Ex. D at 1022.

Dr. Doe testified that a physician had to sign off on the decision to move an inmate into or out of the camera cell, but that a mental health counselor or nurse usually would make the initial decision.  Doe Dep. at 31.  Counselors and nurses could also move an inmate onto or off of Suicide Status or Medical Observation Status without a physician examining the inmate.  Id. at 47-48.  Dr. Doe would not personally evaluate the inmate in a camera cell, or talk with the counselors about the decision, but he would review the note made in the progress chart and sign off on the decision.  Id.  If there was a medical problem with an inmate, it was the obligation of the nurses to notify a physician.  Id. at 32.  If there was a psychiatric issue, then it was the obligation of the nurses to notify the

7

mental health counselors who, if necessary, would notify the psychiatrist.  Id.  at 32-33.

Dr. Doe could occasionally disagree with the mental health counselors' assessments.  Id. at 84.  Dr. Doe rarely saw a patient before signing off on a change in suicide status.  Doe Dep. at 93.  He testified that he had done it perhaps two or three times during his ten years at LCP.  Id.  If the nurse or mental health counselor was uncertain about making the change, the physician would see the inmate.  Id.  If the nurse or mental health counselor was certain in their judgment, Dr. Doe would defer to it.  Id. at 93-94.

### B.   **The Death of Devon Lee Reid**

Devon Lee Reid was twenty-six years old, six feet four inches tall, and weighed about 265 pounds when he entered LCP on July 16, 2004.  Doe Mem. Ex. 1 at 87.  This was not his first time in LCP.  He had been jailed several times before, and had had contact with some, if not all, of the people involved in this case.  Doe Dep. at 24; Powers Dep. at 74, 83-84, 87-94; Waltz Dep. at 10.  Those who were asked said that Reid had been a likeable fellow, was somewhat shy and was easily bullied by those

smaller than he.  Flaherty Dep. at 34; Pl.'s Mem. Ex. G1[1] at 7,
Ex. G2 [Waltz Dep.] at 42-43.

### 1.  Reid's Prior Mental Health History

Reid had been hospitalized for mental health issues
seven or eight times.  Powers. Dep. at 50, Ex. 4.  On November 6,
2002, Reid was admitted to Lancaster General Hospital because he
had purposefully overdosed on medication and drank bleach.
Powers Dep. Ex. 5.  The psychiatrist who saw Reid noted that Reid
stated that he suffered from auditory hallucinations and fears
that someone was out to get him.  Id.  That psychiatrist
diagnosed Reid as paranoid schizophrenic and prescribed
medication.  Id.

On April 10, 2003, while incarcerated at LCP, Reid met
with Dr. Robin Miller.  Powers Dep. at 74, Ex. 4.  Reid told Dr.
Miller that he was having bad hallucinations that told him to
kill himself.  Id.  Dr. Miller diagnosed Reid as suffering from
paranoid schizophrenia and prescribed Haldol and Cogentin for

---

[1]The exhibits attached to plaintiff's memoranda have two
exhibits G.  Further confusing the issue, both Exhibits G consist
of different depositions of Troy Waltz.  We will refer to the
September 25, 2008 Waltz deposition as Exhibit G1, and the
October 17, 2008 Waltz deposition as G2.  Since we will quote
more extensively from the October 17 deposition, we will use the
shorthand "Waltz Dep." to refer to that deposition.

him.  Id.

Later that year, while still at LCP, Reid met with Dr. Stephen Powers, who had taken over as the prison psychiatrist from Dr. Miller.  Reid and Dr. Powers initially met on September 25, 2003 as a follow-up to Reid's visit with Dr. Miller.  Powers Dep. at 83-84, Ex. 3.  During this visit, Reid told Dr. Powers that he did not recall any hallucinations, his tongue was protruding for the past couple of months, and he felt stiff and slow.  Id.  Dr. Powers observed that Reid was communicative and in good spirits.  Id.  Dr. Powers reduced the dose of Haldol that Reid was taking, and began to question the diagnosis of paranoid schizophrenia.  Id.

Dr. Powers had planned to meet with Reid again on October 23, 2003, but Reid declined the visit.  Powers Dep. at 87, Ex. 7.  Either through Dr. Powers going to Reid's cell or the counselor's reports, Dr. Powers recorded in a progress note that Reid was not showing any behavioral problems though his tongue was still protruding, but less so.  Id.

Dr. Powers followed up with Reid on November 28, 2003. Powers Dep. at 89-93, Ex. 8.  During this visit, Dr. Powers observed that Reid stated that he was having trouble breathing and speaking, which Dr. Powers attributed to the reduction in the

10

Haldol dose.  Id.  Reid also stated that he thought people had "worked together against him."  Powers Dep. at 90.  Dr. Powers noted that when Reid said this he was smiling and unafraid, which was not what Dr. Powers would have expected from someone diagnosed as paranoid.  Id. at 91-92.  Dr. Powers decided to take Reid off the Haldol and replace it with Vitamin E.  Id. at 92. Dr. Powers still diagnosed Reid as a chronic paranoid schizophrenic, but was now much less certain -- his notes reflected the possibility that this had been the diagnosis because it "[a]lways made sense to counselors."  Id.

Dr. Powers met with Reid again on January 16, 2004. Powers Dep. at 93-94, Ex. 9.  Dr. Powers recorded that Reid was "[g]etting [a]long", "[h]aving trouble keeping food down", "[h]aving sharp chest pains and gained a lot of weight."  Id. at 93.  Dr. Powers also noted that Reid seemed cheerful, responsive, not suicidal, and was relating well and openly.  Id. at 94. Reid's tongue had also stopped bothering him.  Id.  Based on all of this, Dr. Powers began to "seriously doubt schizophrenic diagnosis", and decided to cease medicating Reid with psychotropic drugs.  Id.

At some point after this, Reid was released from LCP.

11

2.  **Back in LCP**

On July 15, 2004, City of Lancaster Police arrested
Reid.  After subduing him, the police took Reid to the hospital
because they had hit him with a baton on the leg and wrist.
Pl.'s Mem. Ex. B at 59-61.  After an evaluation at the hospital,
Reid was brought to LCP at about 8:20 a.m. on July 16, 2004.[2]
Id. at 58.

Initially, LCP personnel interviewed Reid about his
medical history.  He completed two different questionnaires in
which he complained about pain in his wrist and legs, told his
interviewers that he suffered from schizophrenia and bi-polar
disorder, had been hospitalized for mental health issues, and had
attempted suicide two or three years earlier.  Id. at 88;
Lancaster County Def.'s Mem. Ex. D.  On one of the forms, Reid
also stated that he was not taking any medications at the time
for his mental illness.   Lancaster County Def.'s Mem. Ex. D.

A nurse also interviewed Reid on July 16, 2004.  Id.
Ex. E.  During this interview Reid stated that he had been
committed "for 'acute anxiety attack'", suffered from bi-polar

---

[2]Wood contends, and the defendants do not object, that Reid
was a pretrial detainee during his final incarceration at LCP.
We accept that he was a pretrial detainee for the purposes of
these motions.

12

disorder and paranoid schizophrenia, and had been taking Seroquel for his mental issues while committed but had stopped since his release because he felt he did not need them.  Id.  The nurse noted that Reid should be scheduled to see the psychiatrist.  Id. The next day, the same nurse again examined Reid, this time for the pain in Reid's right wrist and bruising on both thighs, which Reid stated resulted from the police subduing him.  Id.

On July 20, 2004 a nurse examined Reid's wrist again, and treated him for a laceration.  Id. Ex. F.  Two days later, another nurse examined Reid for complaints of burning urination and green discharge, and prescribed antibiotics.  Id.  On August 2, 2004, Reid requested medical attention because there were green spots on his underwear, he had pain in his chest and throat, and he was coughing up mucus.  Id. Ex. H.  Reid was given cold medication and scheduled for a sick call.  Id.

That same day, Sherry Gerhart of the Lancaster County Mental Health Mental Retardation Office ("MHMR") emailed mental health counselor Troy Waltz.  Pl.'s Mem. Ex. G1 at 15-18, Ex. 2. The email consisted of a list of individuals incarcerated at LCP who were also patients of MHMR.  Id.  Waltz explained that he had emailed Gerhart a list of incarcerated individuals that he thought may have been MHMR patients to find out who each one's

MHMR case manager might be.  Waltz Dep. at 6-7.  Although Gerhart

provided Waltz with Reid's case manager's name, there is no

record that Waltz contacted this case manager.  Id. at 8.

On August 5, 2004, defendant Dr. Doe examined Reid for

continued complaints about his wrist.  Lancaster County Def.'s

Mem. Ex. I; Doe Dep. at 33.  Dr. Doe observed swelling over the

lateral right wrist.  Doe Dep. at 34.  Reid explained to Dr. Doe

that the injury occurred during his arrest.  Id.  Dr. Doe ordered

an x-ray and a follow-up visit a week later.  Id.  At no time

during this visit did Reid complain about chest pains or

shortness of breath.  Id. at 33-34.

A private company evaluated the x-ray on August 6, 2004

and determined that Reid had a fracture of his right wrist.

Lancaster County Def.'s Mem. Ex. J.

That day Reid made another request for medical

attention.  Id. Ex. K.  Reid again complained of green spots on

his underwear and coughing up mucus; he also stated that he was

dizzy, experiencing blurry vision, feeling nauseous, and

suffering from chest pains.  Id.

Four days later, Dr. Doe's physician's assistant

examined Reid regarding these symptoms.  Id. Ex. I.  The

physician's assistant noted that the chest pains signaled a

diagnosis of costochondritis[3] because Reid's chest wall was tender to palpation, i.e., the pain could be reproduced by touching the area, and Reid's lungs were "[c]lear to auscultation," i.e., the physician's assistant listened to Reid's lungs and determined they were clear.  Doe Dep. at 69, 90-91; Lancaster County Def.'s Mem. Ex. I; Pl.'s Mem. Ex. B at 91.  The physician's assistant recorded Reid's complaints about blurred vision and dizziness as well as tenderness in his right wrist. Pl.'s Mem. Ex. B at 91.  The progress note also reflects that when Reid told the physician's assistant that he only drank six cups of water each day, the physician's assistant encouraged Reid to double his intake.  Id.

On August 12, 2004, Dr. Doe saw Reid again.  Lancaster County Def.'s Mem. Ex. N; Doe Dep. at 36.  It is uncertain whether the physician's assistant's notes were part of the chart at the time Dr. Doe saw Reid.  Doe Dep. 37-38.  However, Dr. Doe did review the August 10, 2004 progress note the physician's

---

[3]"Costochondritis is an inflammation of the cartilage that connects a rib to the breastbone (sternum). It causes sharp pain in the costosternal joint -- where your ribs and breastbone are joined by rubbery cartilage. Pain caused by costochondritis may mimic that of a heart attack or other heart conditions...Most cases of costochondritis have no apparent cause." MayoClinic.com found at http://www.mayoclinic.com/health/costochondritis/DS00626.

assistant had completed before seeing Reid.  Doe Dep. at 40-41;

Lancaster County Def.'s Mem. Ex. I.  Dr. Doe did not recall Reid

complaining about his chest during his August 12, 2004 visit, and

Dr. Doe concentrated his attention on Reid's wrist.  Doe Dep. at

36, 39, 40, 41.  Dr. Doe referred Reid to an orthopedic

specialist, who Reid saw on August 23, 2004.[4]  Id. at 41;

Lancaster County Def.'s Mem. Ex. N, Q.  Dr. Doe did not meet with

Reid in person again.  Doe Dep. at 43.

On August 17, 2004, Reid again sought medical

attention.  Lancaster County Def.'s Mem. Ex. O.  Reid complained

of headaches, chest pains, back pain, lightheadedness when

standing, phlegm in his throat, and problems with his kidneys,

bladder, and stomach.  Id.  He also specifically requested that

he be tested for "multiple sclerosis, emphysema, cancer, West

Nile virus, mercury, diabetes, anemia, sickle cell, hernia,

transverse myelitis, and Guillain-Barre."  Id.  Two days later,

---

[4]On August 23, 2004, Dr. Edward Maley, the orthopedic
surgeon to whom Dr. Doe had referred Reid, examined Reid and took
another set of x-rays of his right wrist.  Lancaster County
Def.'s Mem. Ex. Q.  Dr. Maley acknowledged that the wrist was
tender and the earlier x-rays showed a fracture, but stated that
the more recent ones did not show a fracture.  Id.  Nonetheless,
Dr. Maley offered to splint Reid's wrist, but Reid declined.  Id.
Dr. Maley scheduled a follow-up visit for one month later.  Id.
Ex. N.

Reid reiterated his request for testing and added Hepatitis C and scabies to the list of potential ailments.  Id. Ex. P.  A nurse responded to Reid's medical request and asked him to list the specific symptoms he was experiencing because LCP "would not test you unless you have symptoms."  Id.

### 3.  **On And Off Suicide Status**

On August 28, 2004, Reid informed one of the nurses that he had "just decided" that he was "going to kill himself," and at 4:15 a.m. Reid was placed on Suicide Status I in a camera cell.  Id. Ex. R.  That same day at about 7:00 p.m., a mental health counselor, Carrie McWilliams, interviewed Reid.  Id. McWilliams noted that Reid stated that he was regularly being robbed and having problems on his cell block and that "he would not be suicidal if moved to any block but 3-1."  Id.  McWilliams noted that Reid was making eye contact, was smiling, was not exhibiting suicidal ideation, and should be removed from suicide status.  Id.

At around 9:15 p.m. Reid refused to be moved to cell block 3-2, and McWilliams met with Reid again.  Id. Ex. S, T. McWilliams noted this time that Reid said that "he could not go to 3-1 or 3-2. [Reid] stated that he would rather move to C-2,

17

but said he would end up right back in MHU. [Reid] said he could not guarantee his safety on C-2." Id. Ex. S.  McWilliams noted that she believed that Reid was manipulating the prison rules, but that he should be kept on Suicide Status I because of his "threats of self-harm." Id.

For the next day and a half Reid remained on Suicide Status I in the MHU without incident.  Id.

At about 9:30 a.m. on August 30, 2004, mental health counselor Troy Waltz interviewed Reid.  Id.  Waltz noted that Reid stated that "he needs to be moved off of MHU now [because] people are 'crazy down here.'  [Reid] states he is fine, not suicidal." Id.  Waltz noted that Reid was smiling, attentive, alert, and did not exhibit suicidal ideation.  Id.  Waltz also noted that he believed Reid was "malingering" and should be removed from all status.  Id.  That same day, at about 5:00 p.m., the Associate Warden of LCP formally notified Reid that the prison was placing him on manipulation status for a thirty day period because of his actions over the previous days.[5]  Id. Ex.

---

[5]When personnel at LCP believe that an inmate is manipulating the prison's rules or policies to gain inappropriate benefits or advantage, then the prison would put that inmate on "manipulation status".  Lancaster County Def.'s Mem. Ex. U; Guarini Dep. at 36.  Manipulation status restricts an inmate's privileges, e.g., no personal phone calls, no time at the gym, no

U.  Reid was returned to cell block 3-2.  <u>See</u> <u>id.</u> Ex. V.

At about 10:15 p.m. on September 1, 2008, corrections officers on cell block 3-2 called the medical department to have a nurse come and check on Reid because he had cut his wrists. <u>Id.</u>  The nurse went down to Reid's cell and observed that he had dried and fresh blood on his face, hands, and shirt, he had a laceration on his left wrist, and prison personnel had found a pen that had been torn apart and sharpened.  <u>Id.</u>  The nurse cleaned and treated Reid's wrist, but did not refer Reid to Dr. Doe because the wound was superficial.  <u>Id</u>; Doe Dep. at 47.  The nurse noted in the progress report that Reid was "slow to respond, mumbling, shaking."  Lancaster County Def.'s Mem. Ex. V.

That same night McWilliams interviewed Reid in the cell block.  <u>Id.</u>  She noted that Reid stated that he had cut his wrists with a pen "because he could not call his parents."  <u>Id.</u> He also stated that he was "'not feeling well,' [but that] he would be alright where he was."  <u>Id.</u>  McWilliams recorded that his was exhibiting suicidal ideation, and had him placed on Suicide Status I.  <u>Id.</u>

At about 7:00 a.m. the next day, corrections officers

---

commissary access.  <u>Id.</u>

took Reid out of his cell.  Pl.'s Mem. Ex. E at 606. Reid had been urinating and defecating on the cell floor during the night and a working party was called to clean the mess.  Id.

During this time Waltz interviewed Reid.  Id. Ex. W. Reid stated that he was not feeling well and asked if he could make a phone call.  Id.  Waltz permitted him to do so.  Id. Reid called his grandmother and talked to her for about half an hour. Id.  Waltz also noted that Reid said that "he would like to be put back on his medication."  Id.  Waltz observed that Reid's speech was slow and his mood was melancholy, but that he was not exhibiting suicidal ideation.  Id.  Waltz had Reid upgraded to Medical Observation Status.  Id.

At about 11:05 p.m. the corrections officer on duty in the MHU noted that McWilliams stopped by Reid's cell.  Reid tried to convince McWilliams to let him have a second phone call. Pl.'s Mem. Ex. E at 607.

The next morning, at about 7:15 a.m., a working party was once again called to clean out Reid's cell because he had urinated and defecated all over it.  Id. at 609.

At about 11:27 p.m. that night, Reid began striking the camera in his cell while singing.  Id. at 608.  The corrections officer on duty at the time tried to get Reid to stop but he

20

would not.  Id.  The officer also noted that "Reid tried to disrupt other inmates and provoke them" but did not provide further detail.  Id.  As a result of his conduct, the supervisor took away Reid's "block out" privileges for the next day.  Id.

The next morning, at about 7:15 a.m., the working party again cleaned Reid's cell.  Reid was given new clothes and a shower.  Id; Lancaster County Def.'s Mem. Ex. Z at 585.

At about 2:30 p.m. on September 5, 2004, the corrections officer on duty observed that Reid did not eat his lunch and laid on the floor of his cell during the entire shift.  Pl.'s Mem. E at 610; Lancaster County Def.'s Mem. Ex. Z at 584.  The officer tried to communicate with Reid, but Reid would only stare and did not respond verbally.  Id.

The next morning the corrections officer on duty noted that Reid did not eat his morning meal.  Lancaster County Def.'s Mem. Ex. Z at 583.  At about 3:25 p.m. that same day, another corrections officer noted that Reid was "placing feces on his cell floor" and had "not returned [the] styrofoam tray" on which he was served lunch.  Pl.'s Mem. Ex. E at 610; see also Lancaster County Def.'s Mem. Ex. Z at 582.

At about 12:45 a.m. on September 7, 2004, a working crew was called to clean Reid's cell.  Pl.'s Mem. Ex. E at 611;

Lancaster County Def.'s Mem. Ex. Z at 98.  The corrections officer on duty noted that Reid refused to change his clothes despite their being soiled.  Pl.'s Mem. Ex. E at 611.  Reid was lying in the fetal position and did not verbally respond to the corrections officers.  Lancaster County Def.'s Mem. Ex. Z at 98. Reid did obey orders by the corrections officers to go into another cell, and told them that he could not walk: he crawled from his befouled cell to a clean one, and then crawled back once the working party had finished.  Id.

At 7:00 a.m. that same day, the corrections officer on duty noted that Reid did not eat breakfast, did not move from the cell floor, and refused, once again, to change his clothes. Pl.'s Mem. Ex. E at 611.  At about 8:45 a.m. that day, mental health counselor Waltz came to Reid's cell to interview him. Lancaster County Def.'s Mem. Ex. W; Waltz Dep. at 28-29.  Waltz found Reid lying on the cell floor.  Id.  Reid did not respond to Waltz.  Waltz noted the cell smelled of urine.  Id.  After this visit, Waltz scheduled Reid for a visit with the prison psychiatrist, defendant Dr. Powers, for September 9, 2004.  Id.

In preparation for this visit, Waltz completed a

checklist form that Dr. Powers had created.[6]  Pl.'s Mem. Ex. B at 128; Powers Dep. at 64.  Waltz noted Reid's bizarre behavior and wrote that Reid "lays in one position and doesn't move for hours, sometimes days.  Urinates on himself.  defecates on cell floor [sic]"  Id.  Waltz also noted that Reid did not talk to himself and did not exhibit signs of anger or aggressiveness.  Id.  Waltz recorded that he believed that Reid's behavior was genuine and he was not being manipulative or exaggerating his symptoms.  Id.  Waltz also marked on the checklist that Reid was not "[v]ery pleased with his/herself" and was "easily insulted," and wrote that Reid exhibited a "[d]epressed mood."  Id.

On September 8, 2004, the corrections officer on duty noted that Reid did not eat his evening meal.  Pl.'s Mem. Ex. E at 613.  The next day Reid "was cleaned as well as could be" and sent to Dr. Powers.  Id.

### 4.   September 9, 2004 Visit With Dr. Powers

Dr. Powers met with Reid for about an hour.  Powers

---

[6]Dr. Powers created a checklist of questions that the prison mental health counselors were to complete prior to inmate-patient visits with Dr. Powers.  Powers' Mem. Ex. C at 63-64.  Powers used the checklist to screen patients and get an idea of what category of mental illness the counselor believed the inmate-patient fell into.  Id.

Dep. at 71; see Waltz Dep. at 90.  Dr. Powers could not say
whether he reviewed Reid's complete medical history before their
visit, but he did review some portion of his notes from his prior
visits with Reid.  Powers Dep. at 46-49, 61.  From this review,
Dr. Powers gleaned that Reid had had some problems with certain
drugs that other doctors had prescribed medication for his mental
health issues.  Id. at 46-47.  During the visit, Dr. Powers asked
questions relating to Reid's medical and personal history --
including previous medical commitments -- whether he abused
drugs, what injuries he had previously received, and family and
work history.  Id. at 50-52.  Dr. Powers testified that during
the course of the visit Reid did not mention any physical or
medical problems he was experiencing.  Id. at 59-60.

        Dr. Powers noted that he saw Reid because Reid was
"[d]efecating, screaming, urine on the floor...voices...[l]ying
on the floor...[s]tays in position times [hours] per day...
[d]epressed mood."  Id. at 49.  When Reid arrived for the visit,
Dr. Powers noted that Reid's pants were soiled and he jiggled his
left breast.  Id.  Dr. Powers observed that Reid's speech was
"within normal limits", that he was upbeat and nonchalant when
talking and his speech was logical and coherent.  Id. at 53, 57.

        Dr. Powers found that many of his observations of Reid

24

were inconsistent with a diagnosis of paranoid schizophrenia.
Dr. Powers testified that Reid's upbeat demeanor when speaking
was "totally incongruent with a diagnosis of schizophrenia." Id.
at 53.  Dr. Powers would expect that someone suffering from
paranoid schizophrenia would display "a lack of affect, a lack of
anything much.  A lack of connectiveness...sometimes fear, which
can also generate, sometimes, anxiety, anger.  And I am seeing
none of those." Id. at 53-54.  Dr. Powers also found that Reid's
coherence undercut the diagnosis of paranoid schizophrenia.  Dr.
Powers testified that "[o]ne of the cardinal symptoms of
schizophrenia is disorganized thought process which will, if
active at the time, manifest as disorganized speech.  Anything
from rambling around to failure to answer questions...[but what
Reid] wanted to say came out very clearly." Id. at 54-55.

        From their conversation, Dr. Powers noted that there
was "no signs of blocking, thought disorder, or hallucinations."
Id. at 55.  Dr. Powers also observed that Reid exhibited "[n]o
evident depressive affect," which Dr. Powers took to imply that
Reid's cutting of his wrist with the pen was not a suicidal act.
Id. at 57-58.  Dr. Powers believed that Reid had injured himself
for the purpose of getting a phone call, which suggested that he
was manipulating the prison rules and was not actually suicidal.

25

Id.

Dr. Powers considered it significant that Reid had so much "insight" into his condition.  Id. at 55-56.  Dr. Powers testified that Reid requested to be put back on medication and sent to a hospital.  Id. at 55.  Dr. Powers stated that the characteristic of schizophrenia with "the highest frequency, the one that accounted for the most discriminating power to diagnose schizophrenia, was the lack of understanding that the patient was ill [, i.e., t]he lack of understanding that he needed a hospital or medication."  Id. at 56.

Based on the visit, Dr. Powers found there was "[n]o consistent clinical picture or behavior."  Id. at 62.  Dr. Powers diagnosed Reid as "malingering...Rule out bipolar disorder," but strongly doubted that Reid suffered from bipolar disorder.[7]  Id. at 58.  Dr. Powers determined that Reid should not take any psychotropic drugs and should return for a follow-up visit in six to eight weeks.  Id. at 62.  Although he did not give the counselors any specific instructions, Dr. Powers testified that

---

[7]Dr. Powers also testified that in his experience every instance of smearing feces (save one particularly strange incident) was linked to mania.  Powers Dep. at 65-67.  Both Dr. Doe and Warden Guarini testified that smearing feces and ingesting urine were manipulative tactics other inmates had used in the past.  Doe Dep. at 50, 59; Guarini Dep. at 14.

"[i]t would be understood that if there was agitation, disturbing behavior, it would be recorded by the correctional officers and by the counselors for my next visit to the prison."  Id. at 63.

Waltz often sat in on Dr. Powers's sessions with inmates, but he could not recall whether he was present for the September 9, 2004 session with Reid.  Waltz Dep. at 36, 91. Waltz did testify that he disagreed with Dr. Powers's diagnosis that Reid was malingering, but he was not certain whether he conveyed his disagreement to Dr. Powers.  Id. at 51.

### 5.   **The Last Week**

After his meeting with Dr. Powers, Reid was taken back to his cell.  Pl.'s Mem. Ex. E at 615.  He did not eat his evening meal that day, but kept the styrofoam tray in the cell. Id.  That night the corrections officer on duty noted that Reid "did state to this officer he tired [sic] of playing this game and he wants to give up.  I advised him to talk to a counselor in the morning."  Id. at 614.

The next day, the corrections officer on duty noted that "Dr. Powers prison phys [sic] is not impressed with inmate Reid, Devon at 1080 [unreadable] has no plans to do anything with this inmate.  Manipulation for sure."  Id. at 616.

27

On September 11, 2004 Reid refused his block out time, and also refused to give up the tray that he had kept in his cell.  Id. at 617.  That morning the corrections officer on duty noted that Reid still had the tray and he would not get another one (or any food, one presumes) until he returned the tray.  Id. That afternoon prison personnel removed Reid from his cell, gave him a shower, gave him new prison clothing, and cleaned out his cell.  Id.  Reid also returned the tray he had in his cell as well as the one he was given for lunch that day.  Id.  The next day the corrections officers on duty recorded that Reid ate neither his breakfast nor his lunch.  Id. at 618.

On September 13, 2004, Waltz cleared Reid to be moved to a non-camera cell, and LCP did so.  Pl.'s Mem. Ex. B at 133; Pl.'s Mem. Ex. E at 620.  Waltz could not recall whether he met with Reid in person on September 13th or whether he relied solely on Dr. Powers's evaluation to transfer Reid to a non-camera cell. Waltz Dep. at 48-49.

At about noon the next day, someone in the MHU called for a nurse to evaluate Reid, stating that there was "seizure activity."  Pl.'s Mem. Ex. B at 133; Lancaster County Def.'s Mem. Ex. EE [Cauler Dep.] at 68, 69-70.  Nurse Darlene Cauler went down to the Unit and found Reid naked, lying face down on the

28

floor.  Cauler Dep. at 68.  Nurse Cauler opened the door to the
cell and Reid looked up at her, made eye contact, and proceeded
to lap up his own urine off the floor.  Id.  Nurse Cauler
recorded in the progress note that Reid had no history of seizure
activity and did not exhibit any of the signs of having had a
seizure.  Pl.'s Mem. Ex. B at 133; Cauler Dep. at 69 ("Someone
having seizures does not make direct eye contact first and
foremost").  Nurse Cauler testified that she spoke briefly with
Reid and then he got up and walked back farther into his cell,
assuring her that there had been no seizure activity.  Cauler
Dep. at 78 ("Nothing that I saw, nothing that he did was
indicative of typical seizure activity...you don't just come out
of a seizure and stand up").  Nonetheless, Nurse Cauler put Reid
on Suicide Status I, and had him moved to a camera cell.  Pl.'s
Mem. Ex. B at 133, Ex. E at 622; Cauler Dep. at 69.

The corrections officers on duty over the next two days
did not record any incidents involving Reid in the prison's pass
book until just past 1:00 a.m. on September 17, 2004, when
corrections officer James Flaherty found Reid unresponsive and
called a "Code Blue".  See Pl.'s Mem. Ex. E at 622-23.  There are
also no medical progress notes involving Reid from this time
because no mental health counselors visited Reid as Waltz

29

acknowledged they should have.  Waltz Dep. at 76-77; Pl.'s Mem.

Ex. B at 132-33.  We do have a DVD from the camera in his cell

from September 16. 2004 until Reid died.  Pl.'s Mem. Ex. O.

### 6.   Video Footage of Reid's Last Twenty-six Hours

The camera in Reid's cell recorded the last twenty-six

hours of his life.  Id.  During most of this time Reid laid or

sat naked on the floor of his cell.  Id.  At the beginning of the

footage we see Reid has two styrofoam trays in his cell.  Id. at

2004-09-16 00:00:16.  At about 6:50 a.m. someone outside of the

cell places something on the ground just outside of the cell's

floor slot.  Id. at 2004-09-16 06:49:39.  Something is again left

outside of Reid's cell's floor slot just before 5:40 p.m. that

day.  Id. at 2004-09-16 17:39:43.  In neither instance does the

camera record Reid bringing whatever is placed outside the floor

slot into his cell.[8]

Reid started September 17, 2004 much as he did the day

---

[8]The Lancaster County defendants assert that these objects
are food trays, which Reid declined to bring into his cell.
Lancaster County Def.'s Mem. at 12 n.2.  The Lancaster County
defendants also assert that corrections officers left another
tray for Reid just before 2:00 p.m. on September 16, 2004.  Id.
We cannot discern anything placed outside of Reid's cell at that
time.  Lancaster County Def.'s Reply Ex. C at 2004-09-16
13:52:05.

before -- lying and moving around on the floor of his cell.  Id.
at 2004-09-17 00:06:03-00:44:48.  Twice Reid makes his way over
to the toilet and sticks his head into it, but we cannot discern
from the DVD for what purpose.  Id. at 2004-09-17 00:39:30,
00:41:55.  The camera records Reid lying on his back and stopping
movement at about 12:45 a.m.  Id. at 2004-09-17 00:44:48.

        Corrections officer James Flaherty was working at the
MHU on the night of September 16-17, 2004.  Pl.'s Mem. Ex. F
[Flaherty Dep.] at 54.  Flaherty had gone on shift around
midnight, and had done the first of his room checks at about
12:10.  Id.  The video footage from that time does not reflect
anyone coming to the cell window before Reid stops moving.  DVD
at 2004-09-17 00:06:03-00:44:48.  But Flaherty testified that
Reid was singing hymns during the night, and Flaherty did not
look directly into the cell to check on Reid until he stopped
singing.  Flaherty Dep. at 12, 57.  Flaherty recalled that after
his second round of checks Reid had stopped singing, so he called
into the cell.  Id. at 57.  When Reid did not respond, Flaherty
testified that he looked into the cell, saw Reid was not moving,
and called the "Code Blue".  Id. at 57-58.

        The camera in Reid's cell recorded someone coming to
Reid's cell and flashing a light onto his body just after 12:56

31

a.m.  DVD at 2004-09-17 00:56:18-00:56:27.  Reid does not seem to move or respond to the light.  Id.  The person with the light returned to the cell window at just past 1:12 a.m. and again flashed the light on Reid.  Id. at 2004-09-17 01:12:01-01:12:21.  This time the person at the window kept the light on Reid for some time.  Id. (we note no motion is captured between 01:12:04 and 01:12:16, i.e., there is a gap in the DVD's continuity, yet the flashlight remains in the same spot at both ends of this gap, implying that the light did not move from Reid's face where it was focused).

Medical staff entered Reid's cell shortly after 1:15 a.m. and began assessing Reid's condition.  PL.'s Mem. Ex. B at 132, Ex. P at 150-53, Ex. O at 01:15:07.  They found no pulse or respiration.  Pl.'s Mem. Ex. B at 132, Ex. P. 152-3.  Medical staff applied an automated external defibrillator and attempted CPR.  Pl.'s Mem. Ex. B at 132.  The defibrillator detected "no shockable rhythms", and Reid's pupils were fixed and dilated.  Id.  They then called 911.  Id.  When paramedics arrived, they applied an EKG to Reid and found that he was asystolic, i.e., without cardiac electrical activity.  Id.

Devon Lee Reid was dead.

32

### 7.  **Autopsy Report**

Dr. Wayne K. Ross performed Reid's autopsy.  Pl.'s Mem.
Ex. Q at 214.  Dr. Ross recorded that Reid's body was a "well-
built, well-nourished male who measures 76½" and weighs 225 +/-
pounds by visual examination."  Id. at 215.  Dr. Ross also noted
that the body smelled of urine and there were traces of toilet
paper in the hair, beard, mouth, throat, stomach, arms, and
thighs.  Id.  Upon examining Reid's lungs, Dr. Ross observed
clots that completely blocked the pulmonary arteries.  Id. at
217.  Dr. Ross determined that Reid's death was natural and the
cause of death was pulmonary emboli.  Id. at 214, 222.  Other
than the emboli, Dr. Ross noted that Reid also had the sickle
cell trait, and did not note any other specific issues with
Reid's body.

### D.  **Medical Expert Testimony**

Plaintiff presents the opinions of two medical experts,
Dr. Robert B. Greifinger and Dr. Raymond F. Patterson.  The
former opined on the quality and nature of the medical care
provided to Reid at LCP.  Pl.'s Mem. Ex. R.  The latter opined on
the quality and nature of the psychiatric care Reid received and
how it may have played a role in Reid's death.  Pl.'s Mem. Ex. S.

33

1.   **Dr. Greifinger's Report**

To prepare his report, Dr. Greifinger reviewed the complaint, Reid's LCP medical, legal, and behavioral files, the autopsy report, Reid's medical records from Lancaster General Hospital relating to the July 15, 2004 injury Reid sustained from police, Reid's medical records from Penn State Hershey Medical Center, and his other, pre-incarceration medical files.  Pl.'s Mem. Ex. R [Greifinger Report] at 2.  Dr. Greifinger found that Dr. Powers had misdiagnosed Reid as malingering and Reid actually did suffer from paranoid schizophrenia.  Id. at 3, 4-5.  Dr. Greifinger also found that the autopsy report noted "a carboxyhemoglobin measurement of 11% (normal 4-8%) [indicating] that Mr. Reid had pulmonary compromise for some time."  Id. at 5. Dr. Greifinger stated that the autopsy report's determination that Reid had "a BUN of 127 and a creatinine of 7.9 mg/dl" suggested that he was severely dehydrated.  Id.

Dr. Greifinger concluded that "Reid was a victim of neglect."  Id.  In particular, Dr. Greifinger faulted LCP for not scheduling Reid for immediate psychiatric and physical evaluations.  Id. at 3, 5.  He also faulted them for not getting Reid's previous psychiatric medical history sooner so they could "formulate a treatment plan for him."  Id.  Dr. Greifinger

34

criticizes LCP personnel for failing to "intervene in sufficient time to save Mr. Reid's life...they each made choices...that lead to pain, suffering, starvation, dehydration, and a humiliating death on the floor of a cell filled with feces and urine." <u>Id.</u> at 6.  Dr. Greifinger opines that "[e]ven if custody and heath care staff relied on Dr. Power's [<u>sic</u>] misdiagnosis of malingering it shocks the conscience that so many people could stand by and watch the horror of Mr. Reid's physical and mental decompensation, starvation, dehydration, and death." <u>Id.</u>

### 2.   **Dr. Patterson's Report**

Dr. Patterson reviewed the complaint, Reid's LCP medical, legal, and behavioral files, the autopsy report, Reid's medical records from Lancaster General Hospital from July 15, 2004, his Penn State Hershey Medical Center records, deposition transcripts from Dr. Powers, Nurse Darlene Cauler, and Nurse Elizabeth Haddox, and the LCP Policies and Procedures.  Pl.'s Mem. Ex. S [Patterson Report] at 1.

Dr. Patterson came to four conclusions.  First, he believed that Dr. Powers failed "to properly diagnose and treat Mr. Reid" because Dr. Powers did not review Reid's hospital records or incorporate what was in them into his diagnosis.  <u>Id.</u>

at 3.   Second, Dr. Patterson concluded that LCP and its personnel
failed "to provide adequate treatment planning" by giving mental
health counselors and licensed practical nurses ("LPN") too much
responsibility, e.g., mental health counselors scheduling patient
visits for Dr. Powers and LPNs modifying inmate's suicide status
and providing medications without physical examinations.   Id.
Third, Dr. Patterson concluded that placing Reid on "manipulation
status...may very well have contributed to the mental health and
medical staff's failure to properly evaluate his complaints."
Id.   Specifically, Dr. Patterson stated that Reid's "bizarre
behavior includ[ing] smearing feces, licking his own urine from
the floor, and lying in a fixed position for several hours at a
time do not appear to have been properly evaluated."   Id.

        **E.**   **Dr. Doe's Review**

        When confronted with Reid's complete medical file,
Reid's bizarre behavior, and his complaints about chest pains,
Dr. Doe testified as to why these facts would not have affected
his diagnosis.   Dr. Doe stated that blood clots like those that
killed Reid can cause hypoxia, i.e., insufficient levels of
oxygen in the blood or tissue, which in turn can cause strange
behavior.   Doe Dep. at 60 ("if someone is low on oxygen they can

have behavior changes").  But Dr. Doe testified that Reid's odd behavior would not have prompted a different diagnosis because Dr. Doe had never seen mental changes as the presenting complaint prior to pulmonary emboli.  Id. ("in the years of working in the emergency room, I saw lots of pulmonary emboli, and I never saw anybody with mental changes being the presenting complaint").

Dr. Doe also testified that when he saw Reid in August of 2004

> there is no mention of the legs.  The chest pain is very clearly musculoskeletal.  And there's not anything raised on the vital signs there that would be any alarm.  Low pulse, normal blood pressure, normal respiratory rate, all speak against there being anything active at that time.

Id. at 66.  Moreover, Dr. Doe was "relatively certain" that he had treated Reid for chest pain in the past, and it had been a musculoskeletal issue then as well.  Doe Dep. at 91-92; see also Powers Dep. at 93.

Dr. Doe testified that the top three reasons for blood clots leading to emboli were "a clotting disorder that [one is] born with," "recent major surgery," and when one has "been immobile, such as, like being on an airplane for a long period of time and not being able to move around."  Id. at 67-68.  None of these conditions was present in Reid's case.

37

Dr. Doe testified that he would be alerted to potential pulmonary emboli by "unilateral, swollen, painful, calf, leg, thigh...being the focus of their complaint...then subsequently, shortness of breath, sometimes associated with intermittent sharp chest pain...[n]ot reproducible by pressing on the chest, [and] an abnormal set of vital signs like tachycardia, respiratory rates increased, hypotension."  Id. at 80.  Again, none of these symptoms was present when the physician's assistant or Dr. Doe examined Reid.  Id. at 81.

Of particular significance to Dr. Doe was the fact that Reid's chest pains were reproducible by touch.  Id.  Dr. Doe testified that this was a common complaint among twenty to thirty year olds, and was most commonly "caused by stress, emotional problems, [or] recent overexertion."  Id.  He stated that if the pain was reproducible by touch and there were no other symptoms present, then stress was the most likely cause and Dr. Doe would not have been prompted to run any further tests.  Id.

## II.  **Analysis**[9]

---

[9]Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the nonmoving party.  Anderson v.

Wood asserts a variety of claims against these defendants. We will first consider the § 1983 claim for violations of the Eighth and Fourteenth Amendments of the U.S. Constitution that plaintiff asserts against Waltz, Flaherty, Dr. Doe, and Dr. Powers. Next we will consider the <u>Monell</u> and supervisory liability claims against Lancaster County and Vincent Guarini, and then turn to the ADA claims. Finally, we will examine Wood's wrongful death claims.

---

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. <u>Liberty Lobby</u>, 477 U.S. at 255.

The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585 n.10 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. <u>Trap Rock Indus., Inc. v. Local 825</u>, 982 F.2d 884, 890 (3d Cir. 1992); <u>Fireman's Ins. Co. of Newark v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir.1982). It is not enough to discredit the moving party's evidence, the non-moving party is required to "present <u>affirmative</u> evidence in order to defeat a properly supported motion for summary judgment." <u>Liberty Lobby</u>, 477 U.S. at 257 (emphasis in original). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249-50. Also, If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

A.   <u>Eighth and Fourteenth Amendment Claims</u>

Wood asserts a § 1983 claim against Waltz, Flaherty, Dr. Doe, and Dr. Powers for violating Reid's Eighth and Fourteenth Amendment rights.  When one is a prisoner, his claims of inadequate medical care are analyzed under the Eighth Amendment.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976).  But when one is a pretrial detainee, his claims are analyzed under the Due Process Clause of the Fourteenth Amendment.  <u>City of Revere v. Massachusetts Gen. Hosp.</u>, 463 U.S. 239, 244 (1983).  In fact, a pretrial detainee cannot look to the Eighth Amendment for protection because those protections do not attach "until after [the State] has secured a formal adjudication of guilt in accordance with due process of law."[10]   <u>Id.</u>

Neither the U.S. Supreme Court nor our Court of Appeals has determined the precise contours of this particular Fourteenth Amendment protection.  We do know that the Fourteenth Amendment affords pretrial detainees protections "at least as great as the Eighth Amendment protections available to a convicted prisoner." <u>Id.</u>  Courts have taken teaching from the Eighth Amendment when fashioning Fourteenth Amendment protections that cover the same

---

[10]Since it is undisputed that Reid was a pretrial detainee, we will dismiss plaintiff's Eighth Amendment claims.

40

area.  Hubbard v. Taylor, 399 F.3d 150, 166 (3d Cir. 2005); Kost

v. Kozakiewicz, 1 F.3d 176, 188 n.10 (3d Cir. 1993).

    The Fourteenth Amendment protections would appear to be

somewhat greater.[11]  The Eighth Amendment provides protections

against "cruel and unusual punishment" while the Fourteenth

Amendment protects against all punishment.  Hubbard, 399 F.3d at

166 (discussing Bell v. Wolfish, 441 U.S. 520, 536-37 (1979).[12]

Pretrial detainees "are entitled to at least as much protection

as convicted prisoners, so the protections of the Eighth

_____

    [11]Compare Harvey v. Chertoff, 263 Fed. Appx. 188, 191 (3d
Cir. 2008) ("We previously have found it constitutionally
adequate to analyze pretrial detainees' claims of inadequate
medical care under the familiar deliberate indifference
standard...and we do so here as well. To act with deliberate
indifference to serious medical needs...is to recklessly
disregard a substantial risk of serious harm.") (internal
citations omitted) with Montgomery v. Ray, 145 Fed. Appx. 738,
739-40 (3d Cir. 2005) ("The District Court correctly noted that a
claim involving inadequate medical treatment of a federal
pretrial detainee is analyzed pursuant to the Due Process Clause
of the Fifth Amendment. However, the Court...then improperly
concluded that claims for inadequate medical care are evaluated
under the same standards as Eighth Amendment claims. [W]e
recently clarified that the Eighth Amendment only acts as a floor
for due process inquiries into medical and non-medical conditions
of pretrial detainees.") (internal citations omitted).

    [12]"The Government concededly may detain [a pretrial
detainee] to ensure his presence at trial and may subject him to
the restrictions and conditions of the detention facility so long
as those conditions and restrictions do not amount to
punishment".

Amendment would seem to establish a floor of sorts." Kost 1 F.3d at 188 n.10 (noting that the Supreme Court has made no determination "regarding how much more protection unconvicted prisoners should receive").  Thus, a plaintiff can sustain a Fourteenth Amendment claim of inadequate medical and mental health care if he establishes that the defendants were deliberately indifferent to the pretrial detainee's serious medical needs.  Natale v. Camden County Correctional Facility, 318 F.3d 575, 581-82 (3d Cir. 2003); Kost, 1 F.3d at 185.  But the inverse is not true.  Were we to deny such a claim for failing to meet the deliberate indifference standard, we would not be acting consistently with the dictates of Bell v. Wolfish. See Hubbard, 399 F.3d at 165-67.

Neither our Court of Appeals nor the Supreme Court have directly addressed what precise standard applies to a pretrial detainee's Fourteenth Amendment claim for inadequate medical care.  See Woloszyn v. County of Lawrence, 396 F.3d 314, 320 n.5. (3d Cir. 2005).  But our Court of Appeals has set a standard to examine liability for § 1983 cases involving suicides of pretrial detainees: "(1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted

42

with reckless indifference' to the detainee's particular
vulnerability."  Id. at 319 (quoting Colburn v. Upper Darby Twp.,
946 F.2d 1017, 1023 (3d Cir. 1991)).  Although this standard only
applies to § 1983 pretrial detainee suicide cases, it relies on
the proposition that "[a] particular vulnerability to suicide
represents a serious medical need."  Id. at 320.  Thus,
substituting the general for the specific, the applicable
standard ought to be that prison personnel are liable for § 1983
claims for pretrial detainee inadequate medical treatment claims
if (1) the detainee had a serious medical need, (2) prison
personnel knew or should have known of that need, and (3) prison
personnel acted with reckless indifference to that detainee's
need.  Our Court of Appeals has not clarified whether acting with
the Fourteenth Amendment's requisite "reckless indifference" to
the risk is the same as acting with the Eighth Amendment's
"deliberate indifference" to that risk.  Id. at 321.

        But the scienter requirements differ under the two
standards.  To be sure, the Eighth and Fourteenth Amendments do
not "impose liability for negligent failure" to provide adequate
medical care.  But the Fourteenth Amendment provides for
liability for "something more than a negligent failure to
appreciate the risk...though something less than subjective

43

appreciation of that risk."  Id. at 320 (internal citation

omitted); see also Farmer v. Brennan, 511 U.S. 825, 835 (1994)

("deliberate indifference describes a state of mind more

blameworthy than negligence").  The Eighth Amendment deliberate

indifference standard requires that the defendant have a

subjective appreciation of the risks to the plaintiff and act

with conscious disregard of that risk.  Id. at 837-38.  But the

Fourteenth Amendment permits recovery if the defendant knew or

should have known about the risk.  Woloszyn, 396 F.3d at 319.  It

would not make sense to require conscious disregard of a risk

that defendant should have known but did not actually know.

Instead, reckless indifference amounts to a "failure to

appreciate [a risk, which] evidences an absence of any concern

for the welfare of his or her charges."  Colburn, 946 F.2d at

1025.  Thus, reckless indifference here is "knowing or having

reason to know of facts which would lead a reasonable man to

realize, not only that his conduct creates an unreasonable risk

of physical harm to another, but also that such risk is

substantially greater than that which is necessary to make his

conduct negligent."  Restatement (Second) of Torts § 500.

          "[M]ere disagreement as to the proper medical treatment

[cannot] support a claim of an eighth amendment violation," but a

44

plaintiff establishes an inadequate medical treatment claim under the Eighth Amendment when prison officials and doctors, "with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition." Monmouth Cty Correctional Inmates v. Lanzaro, 834 F.2d 326, 346, 347 (3d Cir. 1987) (internal quotations omitted). Therefore, in the Fourteenth Amendment context, a constitutional violation will lie when a prison official or doctor recklessly adopts an easier and less efficacious treatment of an inmate's condition.

For a condition to qualify as a serious medical need "the detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death." Woloszyn, 396 F.3d at 320 (quoting Colburn, 946 F.2d at 1023). Furthermore, "the condition must be one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Id.

Here, there are two possible serious medical needs: (1) the condition climaxing in Reid's pulmonary emboli, and (2) Reid's mental health issues. Wood argues that we should treat these two conditions as a single serious medical need. But Wood

45

cannot point to any evidence that would establish that had the medical staff of the prison handled Reid's mental health issues differently he would not have suffered pulmonary emboli.  Without some evidence linking the two together, we cannot treat these conditions as one.

We now turn to the specific claims against each of the defendants.

### 1.   **Dr. Robert Doe**

The record establishes that Dr. Doe did not know of any condition Reid had that would lead to pulmonary emboli, but Wood contends that Dr. Doe should have known about such a condition. Wood argues that there are specific instances that should have prompted Dr. Doe to re-examine and re-diagnose Reid.  Wood points to Reid's inability or unwillingness to stand up when moving from cell to cell on September 7, his September 14 "seizure" activity, and his complaints of chest pains as events that Dr. Doe knew or should have known about which ought to have prompted him to change his diagnosis or examine Reid again.  Dr. Greifinger stated that "[e]ven with clear knowledge of his mental and physical condition, including chest pain, and his clear mental and physical decompensation, including smearing feces and

unresponsiveness on his cell floor, health care and security
staff did nothing but ignore his life-threatening condition for
two whole months."  Pl.'s Mem. Ex. R at 5-6.  But Dr.
Greifinger's statements are conclusory and fail to establish
causation, i.e., that if a doctor had known of Reid's chest pains
and the other events before his death that that doctor would have
diagnosed Reid as having a condition that could result in
pulmonary emboli.

There is also nothing in Dr. Greifinger's or Dr.
Patterson's reports that contradict or call into doubt Dr. Doe's
analysis of why Reid's physical condition did not indicate the
likelihood of pulmonary emboli.  Dr. Doe testified that the
symptoms Reid had reported led him to believe that his chest
pains were musculoskeletal and a recurring, non-life-threatening
condition that Dr. Doe had seen Reid exhibit before. Doe Dep. at
80-81, 90-91.  Nothing in plaintiff's expert reports undermines
Dr. Doe's analysis.  Both of Wood's experts acknowledge that
diagnosing pulmonary emboli is difficult, and do not state
whether Reid presented the tell-tale signs of such emboli.
Greifinger Report at 5-6; Patterson Report at 4.  Although
plaintiff's experts found fault with the level of care LCP
personnel provided Reid, nothing in their reports undermined Dr.

47

Doe's explanations of why he would have ruled out pulmonary emboli based on the facts that Reid reported at the time he examined him. What plaintiff's experts attest to is that Dr. Doe should have diagnosed Reid with a condition that led to pulmonary emboli, but that is a disagreement about Dr. Doe's diagnosis which cannot be the basis for a Fourteenth Amendment inadequate medical treatment claim.

Wood also contends that since Nurse Cauler observed seizure activity and Dr. Doe signed off on the progress note, that Dr. Doe should have examined Reid and, thus, avoided the eventual pulmonary emboli and associated pain and suffering. But Nurse Cauler testified that Reid's behavior when she saw him was inconsistent with seizure activity, and the progress note reflected Nurse Cauler's conclusion. Cauler Dep. at 68, 69, 78. Unless Dr. Doe had reason to disbelieve Nurse Cauler's assessment, there would be no reason for Dr. Doe to examine Reid again. Wood cannot point to anything that suggests either subjectively or objectively that Dr. Doe should have known that Nurse Cauler's assessment was incorrect. Unless Wood can point to a principle that doctors should disbelieve their nurses' observations, his claim cannot proceed on this point.

This leaves the September 7 incident when Reid crawled

48

between cells rather than walk.  One can infer that Dr. Doe knew about this incident because the unusual activity report the corrections officer filled out was copied to the medical department.  Lancaster County Def.'s Mem. Ex. Z at 98.  But Dr. Doe's failure to deduce from this incident that Reid may have a condition that would result in pulmonary emboli can, at most, amount to negligence, which is insufficient to sustain a Fourteenth Amendment claim.

Wood also seeks to hold Dr. Doe liable for failure to provide adequate mental health care to Reid.  Both Dr. Doe's and Dr. Powers's testimony establish that Dr. Doe deferred to Dr. Powers and the mental health counselors when it came to psychiatric cases, and only examined and serviced inmates suffering from the simplest of mental health problems.  Doe Dep. at 18, 31-32; Powers Dep. at 38.  Wood argues that Dr. Doe's failure to properly oversee Dr. Powers amounts to a constitutional injury to Reid.  But while Dr. Doe's accepting Dr. Powers's diagnoses and deferring to him in mental health cases might conceivably be considered negligence, we do not believe it rises so high.  In any event, such hypothesized negligence cannot amount to a constitutional violation and so we shall dismiss all Fourteenth Amendment claims against Dr. Doe.

### 2.   Dr. Stephen Powers

Wood argues that Dr. Powers knew that Reid had mental health issues but "chose to ignore his illness and the records revealing the illness."  Pl.'s Resp. to Powers's Mem. at 28. Wood faults Dr. Powers for failing to get Reid's full mental health history, thus compromising his diagnosis: "What Dr. Powers is not saying is that when Mr. Reid came for his mental status examination, Mr. Reid had a long record of mental illness and that, had Dr. Powers properly reviewed the record, he would have discovered Mr. Reid's history of chronic mental illness and treatment with powerful antipsychotic medication, as well as Mr. Reid's history of suicide attempts." Id. at 25.

Wood suggests that Dr. Powers had no knowledge of Reid's previous mental health history and if Dr. Powers had known this history he would have diagnosed Reid differently.  The record does not support this view.  Dr. Powers admitted that he had not reviewed Reid's entire medical file, but he testified that he had reviewed his notes from (many) previous sessions with Reid and asked Reid questions regarding his history.  Powers Dep. 46-53.  The characterization that Dr. Powers simply ignored Reid's mental health history when he concluded that Reid was malingering and was not suffering from paranoid schizophrenia is

belied by the fact that Dr. Powers's conclusion, correct or not, is consistent with the observations and determinations Dr. Powers made in previous sessions with Reid.   Compare Powers Dep. at 83-84, 87, 89-94, Exs. 3, 7, 9 with Powers Dep. at 53-58.   There is no evidence that Dr. Powers was not exercising his reasoned professional judgment.   Also, nothing in the record establishes that if Dr. Powers had reviewed Reid's entire medical file that he would have changed his diagnosis.   To the contrary, the record is quite clear that Dr. Powers knew how others had diagnosed Reid, but believed they got it wrong.   Powers Dep. at 53-58, 62, 83-84, 92, Exs. 3, 7, 9.

A reasonable jury could not glean from this record that Dr. Powers simply ignored all past judgments about Reid, ignored his symptoms, and came up with his diagnosis because he was recklessly indifferent to Reid's plight.   Wood disagrees with Powers's diagnosis of Reid, but that disagreement cannot constitute the basis of a Fourteenth Amendment claim for inadequate medical treatment.   At the very worst, Dr. Powers may have been negligent for failing to review Reid's entire mental health history, but that, again, is not enough to sustain a § 1983 claim against Dr. Powers.

### 3.   **Mental Health Counselor Troy Waltz**

Wood could establish that Waltz was negligent in his care of Reid, but we cannot see how these facts establish that Waltz was recklessly indifferent to Reid's suffering.  Wood argues that Waltz was deliberately indifferent because he failed to get Reid's mental health records from MHMR, failed to tell Dr. Powers that he disagreed with his diagnosis of Reid, and failed to check up on Reid on September 15 and 16 when Reid was on Suicide Status I.

Prior to the September 9, 2004 psychiatric exam with Dr. Powers, Waltz and other members of the LCP mental health care staff had repeatedly examined Reid, and once they determined that a psychiatric evaluation was warranted, scheduled Reid's visits with Dr. Powers.  Lancaster County Def.'s Mem. Ex. R, S, T, U, V, W; Pl.'s Mem. Ex. B at 128, Ex. E at 607; Waltz Dep. at 28-29. Waltz testified that he disagreed with Dr. Powers's assessment that Reid was malingering, and believed that Reid was suffering from paranoid schizophrenia or some other mental illness.  Waltz Dep. at 51.

We do not see what Waltz should have done differently. Waltz was not in a position to countermand Dr. Powers's course of treatment.  There is no evidence that Waltz believed that Dr.

Powers conducted his assessment in bad faith or that the
diagnosis was an attempt to deny Reid the mental health treatment
he needed.  To hold Waltz liable for his failure to contradict
Dr. Powers would require us to fashion a rule under which mental
health counselors would be obliged to try to undo the actions of
prison psychiatrists whenever they have a good faith disagreement
with a diagnosis.  Such a rule would place mental health
counselors in an untenable position that would undermine the care
that inmates receive in prisons.  In any event, we are aware of
no authority from which we could infer such an expansive rule.

       We agree with Wood that Waltz, or someone else from the
medical staff, ought to have checked in on Reid on September 15
and 16, as LCP medical procedures required.  But this failure
could only establish that Waltz and the medical staff were
negligent in the provision of mental health care to Reid, but not
that they were recklessly indifferent to his mental health needs.
As such, Wood cannot sustain his Fourteenth Amendment claim
against Waltz, and we shall dismiss it.

       But even if we assume that Waltz violated Reid's
constitutional rights by failing to contradict Dr. Powers,
liability would be barred by the doctrine of qualified immunity.
Qualified immunity limits liability to those cases in which

officials "violate clearly established statutory or
constitutional rights of which a reasonable person would have
known." <u>Miller v. Clinton County</u>, 544 F.3d 542, 547 (quoting
<u>Harlow v. Fitzgerald</u>, 457 U.S. 194, 200 (2001)).  "Once it is
determined that evidence of a constitutional violation has been
adduced, courts evaluating a qualified immunity claim move to the
second step of the analysis to determine whether the
constitutional right was clearly established." <u>Id.</u> (internal
quotations omitted).  "A right is clearly established for
purposes of qualified immunity when its contours are sufficiently
clear that a reasonable official would understand that what he is
doing violates that right." <u>Hubbard</u>, 538 F.3d at 236 (internal
quotations and citations omitted).  As we have already stated, to
hold Waltz liable would create a new right for pre-trial detainee
that would require mental health counselors to undermine and
contradict prison psychiatrists when the two have a good faith
disagreement as to a diagnosis.  As such, the right in question
cannot be clearly established, and there is no basis to say a
reasonable mental health counselor would understand that such an
expansive rule applied.

### 4.   Corrections Officer James Flaherty

Since we must make all inferences for the plaintiff, we must hold that Wood can sustain his Fourteenth Amendment claim against Flaherty.  The DVD shows Reid moving until about 12:45 a.m.  DVD at 2004-09-17 00:06:03-00:44:48.  The next footage, at about 12:56 a.m., shows Flaherty's flashlight peeking through the window in the cell door.  Id. at 00:56:18-00:56:27.  Then more than fifteen minutes pass before one can see Flaherty's flashlight at the window again.  Id. at 01:12:01-01:12:21.  After Flaherty looked in on Reid the second time it is obvious that he called a "Code Blue" because medical personnel entered the cell less than three minutes later.  Id. at 01:15:07.  From this DVD segment, a reasonable juror could infer that Flaherty knew Reid was unresponsive at 12:56 a.m.  The fact that Reid was unresponsive at 12:56 a.m. would have made a layperson recognize that the situation required medical attention, i.e., that a serious medical need existed, and Flaherty's failure to call the "Code Blue" until ten minutes or so after he saw Reid at 12:56 a.m. could reasonably be held to be deliberate indifference to that serious medical need.

Flaherty testified that he called the "Code Blue" once he realized Reid was unresponsive.  Flaherty Dep. at 12, 57-58.

But to overcome the inferences from the DVD that we must grant to the plaintiff, we would have to credit Flaherty's testimony about when he knew Reid was unresponsive.  But only a jury can determine whether a witness is credible, and therefore we must deny Lancaster County's motion for summary judgment as it applies to Flaherty.

Even if Flaherty may have violated Reid's constitutional rights, he cannot be held liable unless his actions "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Miller</u>, 544 F.3d at 547 (quoting <u>Harlow</u>, 457 U.S. at 200); <u>see</u> <u>also</u> <u>supra</u> at 57-58.  Here, the facts do not permit a finding of qualified immunity.  Taking the facts in the light most favorable to the plaintiff, Wood can establish that Flaherty acted with deliberate indifference when he passed by Reid's cell and found him unresponsive.  It is clearly established constitutional law that knowing denial or unnecessary delay of medical treatment can amount to a constitutional violation.  <u>Estelle</u>, 429 U.S. at 103-04.  A reasonable officer would know that if a pretrial detainee was unresponsive in his cell there would be constitutional implications for not taking reasonable steps to get that detainee medical care and do so as soon as possible under the

circumstances here.  Failing to do so is a prototypical instance
of a breach of a pre-trial detainee's right to adequate medical
care.  Id.  Thus, Flaherty does not on this record have qualified
immunity from liability.

### B.    **Monell and Supervisory Liability**

Wood asserts a claim under Monell v. Dep't of Social
Services, 436 U.S. 658 (1978).  Specifically, Wood contends that
Lancaster County enacted policies at LCP that caused Reid to
suffer constitutional injury.  In order to establish a Monell
claim, a plaintiff must show that a policy, or lack thereof, was
the proximate cause of plaintiff's alleged constitutional injury.
Bielicz v. Dubinon, 915 F.2d 845, 850-51 (3d Cir. 1990).  A
plaintiff can establish that the policymaker -- here, Warden
Guarini -- is liable if the plaintiff shows that such a defendant
acted with deliberate indifference to the likelihood of
constitutional injury when he established or failed to establish
a policy that directly caused the plaintiff's constitutional
injury.  J.M.K. v. Luzerne County Jivenile Detention Ctr., 372
F.3d 572, 586 (3d Cir. 2004).  The only policy failure Wood
points to is LCP's failure to have "some policy to ensure that
corrections officers are complying with the suicide status

policies, [and i]f LCP had a policy of recording missed meals and notifying the medical department, Decedent could have avoided suffering and death."  Pl.'s Resp. to Lancaster County Def.'s Mot. at 36.

But this assertion mischaracterizes LCP's policies and procedures.  Corrections officers working in the MHU recorded events in the pass books, and if an event was noteworthy personnel recorded it in an unusual activity report.  See, e.g., Pl.'s Mem. Ex. B at 133, Ex. D at 1022, Ex. E.  The pass books demonstrate that the corrections officers were quite diligent about recording missed meals.  E.g., Pl.'s Mem. Ex. E 610-18.  We do not see what purpose would be served by a policy of notifying the medical staff about an inmate opting not to eat one or more of his meals when there are no other obvious signs of physical distress.

There is also no evidence that the lack of these policies caused Reid's death.  Assuming LCP failed to have a policy that properly recorded corrections officers' compliance with suicide status protocols, we do not see how lack of such a policy caused Reid injury.  Despite the allegedly lacking policies, the medical staff were all abundantly aware of Reid's odd behavior, but had come to the conclusion (correct or not)

58

that Reid was malingering.  There is no evidence that an enhanced recording policy would have changed Dr. Powers's diagnosis or prevented Reid's death.  The plaintiff has also presented no evidence linking Reid's fatal emboli to his failure to eat some of his meals.  Without establishing causation between the lack of policy and the alleged constitutional injury, no claim can lie. Therefore, we will dismiss the Monell claims against Lancaster County and Warden Guarini.

Wood also asserts a claim for supervisory liability against Warden Guarini.  A supervisor may also be liable "if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." J.M.K., 372 F.3d at 586.  Here, Wood presents no evidence that Warden Guarini directed those under him to cause Reid's injury or knew and acquiesced to their allegedly violating his constitutional rights.  Pl.'s Resp. to Lancaster County Def.'s Mot. at 38.  Without evidence of scienter, Wood cannot sustain his supervisory liability claim against Warden Guarini, and we must dismiss it.

C.     **Americans With Disabilities Act**

Wood asserts a claim under Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.  Under this statute, a plaintiff can recover from a "public entity" if he establishes that (1) he is a qualified individual, (2) with a disability, (3) he was excluded from participation in, or denied the benefits of, the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity (4) by reason of his disability.  Bowers v. Nat'l Collegiate Athletics Ass'n, 475 F.2d 524, 553 n.32 (3d Cir. 2007).

As an initial matter, we note that one cannot bring Title II ADA claims against individuals.  See Emerson v. Theil College, 296 F.3d 184, 189 (3d Cir. 2002); see also Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d 98, 107 (2d Cir.2001); Walker v. Snyder, 213 F.3d 344, 346 (7th Cir.2000) cert. denied, 531 U.S. 1190 (2001); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n. 8 (8th Cir.1999) (en banc).  Thus, we will dismiss all claims under Title II of the ADA that are against individual

60

defendants.

Lancaster County is the only remaining defendant against whom the plaintiff can assert this claim.  The County argues that the plaintiff has failed to proffer any evidence that establishes the third or fourth prong of the prima facie case for a violation of Title II of the ADA.  In particular, the County argues that plaintiff cannot point to any instance of a service, program, or activity from which Reid was excluded from or any instance of discrimination because of his disability.

Wood first argues that mental health counselor Waltz failed to request Reid's medical records from MHMR or attempted to obtain Reid's medications to provide treatment consistent with what he received at MHMR.  Pl.'s Resp. to Lancaster County Def.'s Mot. at 40; Pl.'s Mem. Ex. G at 15-18, Ex. 2.  But Wood cannot point to any policy, procedure, or custom in operation at LCP when Reid was incarcerated that required mental health counselors to order medical records from other institutions.  Thus, LCP's failure to get Reid's medical records from MHMR cannot constitute the denial of a program, benefit, or service.

Wood's claim that LCP failed to obtain Reid's medications also cannot sustain his ADA claim.  Reid inititally stated that he was not taking any medications.  Lancaster County

Def.'s Mem. Ex. D.  He also told the nurse who examined him on July 16, 2004 that he had been on psychotropic medication but stopped taking it because he felt that he did not need it.  Id. Reid requested medication on September 2, 2004 when talking with Waltz.  Lancaster County Def.'s Mem. Ex. W.  Shortly after that conversation, Reid met with Dr. Powers and reiterated his request for psychotric medication.  Powers Dep. at 55.  But Dr. Powers diagnosed Reid as a malingerer, and Reid did not receive those medications because a psychiatrist had determined that they were not warranted.  Dr. Powers's denial of medication was predicated on his belief that Reid was not disabled and not because he was disabled.

Wood contends that the failure of the medical staff to come and see Reid between September 15 and Reid's death during the early hours of September 17 (as LCP mental health policy required) was a denial of a service LCP offered.  Waltz Dep. at 76-77; Pl.'s Mem. Ex. B at 132-33.  Wood argues that this alone is enough to sustain his ADA claim.

Although this failure suffices to establish a denied service, it does not on its own establish that LCP denied that service because Reid suffered from a disability.  To establish that this denial was due to Reid's disability, Wood makes the odd

argument that "[b]y September of 2004, there is little doubt that the prison staff did not want to deal with [Reid].  He smeared feces, drank his urine, and urinated on himself and throughout his cell.  This bizarre behavior, however, is part of his severe mental and physical illness.  The staff avoided contact with Devon Reid specifically because of his illness."  Pl.'s Resp. to Lancaster County Def.'s Mot. at 40.  From this we glean that the plaintiff is arguing that LCP's staff was avoiding Reid because of his bizarre behavior which creates an inference that they were avoiding him because of his illness, and thus denying Reid services because of his disability.

But no reasonable factfinder could hold on this record that the staff was avoiding Reid.  In fact, the record documents the opposite.  It was only shortly before the month of September -- by which time plaintiff asserts that LCP staff no longer wanted to deal with Reid -- that Reid began acting oddly.  Lancaster County Def.'s Mem. Ex. R.  But it was during September that Reid repeatedly met with mental health counselors, a nurse, Dr. Powers, had his cell repeatedly cleaned, was given new clothes and taken to showers -- hardly a group who "avoided contact with Devon Reid."  Lancaster County Def.'s Mem. Ex. V, W, Ex. Z at 98, 582-85; Pl.'s Mem. Ex. B at 128, 133, Ex. E at 606-

613, 620; Powers Dep. at 71; Cauler Dep. at 68.  Even if the record substantiated the plaintiff's claim that the staff was somehow avoiding Reid, Wood could not point to anything of record that would establish that this alleged avoidance was motivated by Reid's disability.

But we are dignifying plaintiff's contention too much. Only by ignoring the record before us could Wood establish that Reid was denied services <u>because</u> he suffered from a disability. We see none of the avoidance that plaintiff tries to conjure.  We see many instances that September where LCP staff interacted with Reid.  We will therefore dismiss the plaintiff's claim under Title II of the ADA against Lancaster County.

### D.   <u>Wrongful Death</u>

Wood brings wrongful death claims against all remaining defendants.  Pennsylvania's wrongful death statute permits a plaintiff "to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime." 42 Pa. Cons. Stat. Ann. § 8301(a).  A wrongful death claim "is derivative of the underlying

tortious acts that caused the fatal injury." Sunderland v. R.A. Barlow Homebuilders, 791 A.2d 384, 391 (Pa. Super. 2002), aff'd, 838 A.2d 662 (2003).

The defendants in this case generally have immunity from negligence suits because of the Pennsylvania Political Subdivision Tort Claims Act ("the Act"). 41 Pa. Cons. Stat. Ann. § 8501, et seq. The Act covers the Lancaster County defendants as well as both Dr. Doe and Dr. Powers, despite their being independent contractors, because "[a]ny person who is acting or who has acted on behalf of a government unit, whether on a permanent or temporary basis, whether compensated or not," is an employee of that governmental unit. 42 Pa. Cons. Stat. Ann. § 8501; see also Leshko v. Servis, 423 F.3d 337, 342 (3d Cir. 2005). The Act allows for liability for eight different types of negligent acts, all of which are narrowly construed, and none of which apply here. Id. § 8542; Kiley by Kiley v. City of Philadelphia, 645 A.2d 184, 185 (Pa. 1994).

But the Act also provides that governmental immunity does not apply to an employee if that employee's actions "caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct." Id. § 8550. This exception to governmental immunity permits an individual to bring

65

suit against government employee defendants who, acting in the scope of their duties, commit crimes, fraud, or intentional torts against the individual.  See Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006).

As we have discussed at length above, supra at II.A and II.B, the only defendant whose actions theoretically rise to the level of actual malice or willful misconduct would be corrections officer Flaherty.  Otherwise, the record establishes that the other defendants did not act with the requisite culpability.  The wrongful death claims against these defendants must be dismissed.

We note that Wood's wrongful death claim against Flaherty is subsumed under the Fourteenth Amendment claim because to establish the wrongful death claim Wood must prove Flaherty's actual malice or willful misconduct, which is a greater burden than the reckless indifference he must prove to establish his Fourteenth Amendment claim.  But the wrongful death claim against Flaherty nevertheless must go to a jury.

BY THE COURT:

__\s_____

Stewart Dalzell, J.

66

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CURTIS WOOD                    :          CIVIL ACTION
                              :
        v.                    :
                              :
CITY OF LANCASTER, et al.     :          NO. 06-3033

_____     ORDER

        AND NOW, this 13th day of January, 2009, upon

consideration of the motion for summary judgment filed by

defendants Lancaster County, Warden Vincent Guarini, Troy Waltz,

and James Flaherty filed (docket entry #28), Dr. Stephen Powers's

summary judgment motion (docket entry #25), his motion to amend

his motion (docket entry #31), Dr. Robert Doe's summary judgment

motion (docket entry #27), the plaintiff's responses, and the

replies thereto,  it is hereby ORDERED that:

        1.   Dr. Stephen Powers's motion to amend his summary

judgment motion is GRANTED;

        2.   Dr. Stephen Powers's motion for summary judgment

is GRANTED;

        3.   Dr. Robert Doe's motion is GRANTED;

        4.   The motion filed by Lancaster County, Warden

Vincent Guarini, Troy Waltz, and James Flaherty is GRANTED in

part;

        5.   All claims against Lancaster County, Warden

Vincent Guarini, and Troy Waltz are DISMISSED;

      6.   In all other respects, that motion is DENIED; and

      7.   By January 20, 2009, the remaining parties shall jointly REPORT by fax (215-580-2156) to Chambers whether a settlement conference would be fruitful.

              BY THE COURT:

              __\s\__Stewart Dalzell_____

              Stewart Dalzell, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CURTIS WOOD                    :          CIVIL ACTION
                               :
        v.                     :
                               :
CITY OF LANCASTER, et al.      :          NO. 06-3033

_____ <u>JUDGMENT</u>

        AND NOW, this 12th day of January, 2009, in accordance
with the accompanying Memorandum and Order, and the Court having
this day granted various motions for summary judgment, JUDGMENT
IS ENTERED in favor of defendant Lancaster County, Warden Vincent
Guarini, Troy Waltz, Dr. Stephen Powers, and Dr. Robert Doe and
against plaintiff Curtis Wood with each side to bear its own
costs.


                    BY THE COURT:

                    __\s\__Stewart Dalzell_____

                    Stewart Dalzell, J.