## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CURTIS WOOD, Administrator for the Estate of DEVON LEE REID, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 06-3033 |
| CITY OF LANCASTER, et al. | : | |
| | : | |
| Defendants. | : | |

## JOINT PRETRIAL STIPULATION

### I.     APPLICABLE LAW

This Court is familiar with the facts of this case brought by Plaintiff Curtis Wood,

administrator for the Estate of Devon Lee Reid ("Decedent" or "Reid"), following Reid's death

while he was detained at the Lancaster County Prison ("LCP").

As set forth in this Court's Memorandum opinion dated January 13, 2009 (the

"Memorandum"),[1] the only legal issues remaining as to the sole remaining Defendant,

Corrections Officer James Flaherty ("CO Flaherty"), are Plaintiff's claims pursuant to 42 U.S.C.

§ 1983 alleging violations of the Fourteenth Amendment to the United States Constitution, and

Plaintiff's wrongful death claims under Pennsylvania common law.

The applicable legal standards to be applied also are set forth in the Court's

Memorandum at pages 40-45, 56, and 66:

> Wood asserts a § 1983 claim against ... Flaherty ... for violating
> Reid's Eighth and Fourteenth Amendment rights. ... [W]hen one is
> a pretrial detainee, his claims are analyzed under the Due Process
> Clause of the Fourteenth Amendment. City of Revere v.
> Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983). ...

---

[1]     A copy of the Memorandum is attached at Exhibit A.

We do know that the Fourteenth Amendment affords pretrial detainees protections "at least as great as the Eighth Amendment protections available to a convicted prisoner." Id. Courts have taken teaching from the Eighth Amendment when fashioning Fourteenth Amendment protections that cover the same area. Hubbard v. Taylor, 399 F.3d 150, 166 (3d Cir. 2005); Kost v. Kozakiewicz, 1 F.3d 176, 188 n.10 (3d Cir. 1993).

…

Thus, **a plaintiff can sustain a Fourteenth Amendment claim of inadequate medical and mental health care if he establishes that the defendants were deliberately indifferent to the pretrial detainee's serious medical needs.** Natale v. Camden County Correctional Facility, 318 F.3d 575, 581-82 (3d Cir. 2003); Kost, 1 F.3d at 185. …

[T]he applicable standard ought to be that **prison personnel are liable for § 1983 claims for pretrial detainee inadequate medical treatment claims if (1) the detainee had a serious medical need, (2) prison personnel knew or should have known of that need, and (3) prison personnel acted with reckless indifference to that detainee's need.** Our Court of Appeals has not clarified whether acting with the Fourteenth Amendment's requisite "reckless indifference" to the risk is the same as acting with the Eighth Amendment's "deliberate indifference" to that risk. [Woloszyn v. County of Lawrence, 396 F.3d 314,] at 321 [(3d Cir. 2005)].

But the scienter requirements differ under the two standards. To be sure, the Eighth and Fourteenth Amendments do not "impose liability for negligent failure" to provide adequate medical care. But the Fourteenth Amendment provides for liability for "something more than a negligent failure to appreciate the risk...though something less than subjective appreciation of that risk." Id. at 320 (internal citation omitted); see also Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("deliberate indifference describes a state of mind more blameworthy than negligence"). … **[T]he Fourteenth Amendment permits recovery if the defendant knew or should have known about the risk.** Woloszyn, 396 F.3d at 319. … **[R]eckless indifference amounts to a "failure to appreciate [a risk, which] evidences an absence of any concern for the welfare of his or her charges."** Colburn, 946 F.2d at 1025. Thus, **reckless indifference here is "knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary**

to make his conduct negligent." Restatement (Second) of Torts §
500.

"[M]ere disagreement as to the proper medical treatment [cannot]
support a claim of an eighth amendment violation," but a plaintiff
establishes an inadequate medical treatment claim under the Eighth
Amendment when prison officials ..., "with deliberate indifference
to the serious medical needs of the inmate, opt for an easier and
less efficacious treatment of the inmate's condition." Monmouth
Cty Correctional Inmates v. Lanzaro, 834 F.2d 326, 346, 347 (3d
Cir. 1987) (internal quotations omitted). Therefore, **in the
Fourteenth Amendment context, a constitutional violation will
lie when a prison official ... recklessly adopts an easier and less
efficacious treatment of an inmate's condition.**

**For a condition to qualify as a serious medical need "the
detainee's condition must be such that a failure to treat can be
expected to lead to substantial and unnecessary suffering,
injury, or death."** Woloszyn, 396 F.3d at 320 (quoting Colburn,
946 F.2d at 1023). Furthermore, **"the condition must be one** that
has been diagnosed by a physician as requiring treatment or one
**that is so obvious that a lay person would easily recognize the
necessity for a doctor's attention."** Id.

...

Even if Flaherty may have violated Reid's constitutional rights, **he
cannot be held liable unless his actions "violate clearly
established statutory or constitutional rights of which a
reasonable person would have known."** Miller, 544 F.3d at 547
(quoting Harlow, 457 U.S. at 200); see also supra at 57-58. ... It is
clearly established constitutional law that knowing denial or
unnecessary delay of medical treatment can amount to a
constitutional violation. Estelle, 429 U.S. at 103-104.

...

We note that **Wood's wrongful death claim against Flaherty is
subsumed under the Fourteenth Amendment claim because to
establish the wrongful death claim Wood must prove
Flaherty's actual malice or willful misconduct, which is a
greater burden** than the reckless indifference he must prove to
establish his Fourteenth Amendment claim.

Memorandum, at 40-45, 56, and 66 (emphasis added).

Accordingly, the remaining questions to be answered at trial under these standards is

whether (1) Devon Reid had a serious medical need; (2) whether CO Flaherty knew or should

have known; and (3) whether CO Flaherty deliberately or recklessly disregarded this serious

medical need. Additionally, the issue of whether any actions or omissions of CO Flaherty

caused and/or would have prevented Devon Reid's alleged suffering and/or his death remains.

## II.    AGREED FACTS

1.    At approximately 12:45 a.m. on September 17, 2004, Reid stopped moving in his

cell.

2.    At approximately 12:56 a.m. on September 17, 2004, CO Flaherty checked on

Reid through his cell door window.

3.    At approximately 1:12 a.m. on September 17, 2004, CO Flaherty again viewed

Reid through his cell door window.

4.    At approximately 1:15 a.m. on September 17, 2004, medical personnel

responding to the Code Blue entered Reid's cell, found no pulse or respiration, and began

attempts to resuscitate him. Memorandum, at 32.

5.    Medical staff applied an automated external defibrillator and attempted CPR. Id.

6.    The defibrillator detected no shockable rhythms, and Reid's pupils were fixed and

dilated. Id.

7.    When paramedics arrived after LCP medical staff called 911, they applied an

EKG to Reid and found that he was without cardiac electrical activity. Id.

8.    The cause of death noted in the autopsy report was pulmonary emboli.

## III.    DISPUTED FACTS

A.    Plaintiff's Version

1.    On July 15, 2004, Devon Lee Reid, decedent, was incarcerated at Lancaster

County Prison following an altercation with Lancaster City Police Officers. Shortly after his

- 4 -

admission to Lancaster County Prison, Mr. Reid completed, with the assistance of a corrections

officer, the health receiving questionnaire and indicated that he had a history of mental illness,

specifically schizophrenia and bipolar disorder. At the time of his admission to Lancaster

County Prison, Mr. Reid was 6 foot 4 inches and weighed an estimated 265 pounds. As a result

of his mental illness, Mr. Reid had been on Social Security Disability/SSI.

2.      On July 16, 2004, the decedent was seen in the commitment area by nurse Brodt,

who noted that he had just been committed to the prison after being seen at Lancaster General

Hospital for an acute anxiety attack. The decedent notified Ms. Brodt that he suffered with

bipolar disorder as well as paranoid schizophrenia. According to the note, he advised her that he

was on the medication Seroquil, but had not been taking his medication.

3.      Throughout the course of his incarceration, Devon Reid had multiple complaints

of various health problems. He had been placed on and taken off Suicide Status several times

from August 28, 2004 throughout the remainder of his incarceration.

4.      The suicide status and mental health status standard operating procedures of

Lancaster County Prison dated March 2001 provide for four levels of care for mentally ill

inmates. The four levels of care provide for periodic random checks, provide for various levels

of medical care and provide for specific items that the inmate is permitted to have as well as

inmate privileges. Suicide status level one (SS1) provides that an inmate will be placed in a

camera cell with a suicide smock, a mattress and a bible and requires random 15 minute checks

by the correctional officer on duty. Inmates on SS1 are supposed to have two hours of block-out

per day with one hour in the A.M. and one hour in the P.M.

5.      On September 1, 2004, the claimant had been moved back to general population

on block 3-2, at which time he cut his wrists with a pen. He exhibited poor eye contact, shaking,

and poor communication. Carrie McWilliams, the mental health counselor assessed him with
suicidal ideation and placed him on suicide status 1 in the medical housing unit.

6.    In the three weeks prior to his death, Devon Reid exhibited bizarre behavior
including repeatedly urinating and defecating on himself, smearing feces, ingesting urine and not
eating meals.

7.    Corrections officers do not consistently record when inmates refuse or fail to eat
meals. Generally such a record is made only when the corrections officer remembers that the
inmate has not eaten on his shift for three (3) days straight.

8.    On September 14, 2001, Nurse Darlene Cauler was called to the medical housing
unit to evaluate "seizure activity". She found the decedent naked, lying face down on the floor.
When the door was opened, Mr. Reid allegedly looked directly at the nurse and proceeded to
"lap up his urine off the floor".

9.    On September 14, 2004, as a result of ongoing bizarre behavior, Mr. Reid was
transferred to cell 1080 and again placed on suicide status 1. The pass-on book indicates that he
was given a smock and a mattress.

10.    From September 14, 2004 at 12:00 p.m., until the time of his death, September 17,
2004, Mr. Reid was not seen by any medical staff, including nurses, doctors, or mental health
counselors.

11.    Portions of that time period have been captured on the video recording,
specifically from September 16th at 12:00 midnight through the time of his death at about 1:10
a.m. on September 17 and until 2:12 a.m. on September 17th .

12.    During the 26 hours captured on this video, Mr. Reid is seen naked in his cell,
primarily lying on the floor for nearly the entire time. During the 26 hours that are captured on

- 6 -

videotape, inmate Reid was not provided with any blockout time, although suicide status clearly provides for blockout time alone.

13.     During this time period, decedent did not eat or drink.

14.     During his last 26 hours decedent does not use the toilet or sink facilities appropriately although he does put his head in the toilet at 00:35:03 hours, at 00:39:30 hours; and at 00:41:54 hours on September 17, 2004.

15.     There is no audio provided with this video recording.  The video recording is motion activated and any motion within the cell is detected and motion outside the door window is also recorded on the video.

16.     It is the guard's responsibility during the checks to verbally speak to the inmate who is on suicide status.

17.     It is Corrections Officer Flaherty's typical practice to make the checks at the inmates cell every 15 minutes or so, however, sometimes he merely checks the video near his desk.

18.     On the night of Devon's death, Mr. Flaherty made only two checks, once at 00:56:18 to 00:56:26 and the other at 1:12:01 to 1:12:19.

19.     On the night of his death, Defendant Flaherty observed the claimant sticking his head in the toilet. Officer Flaherty noted in his report of September 17, 2004 that inmate Reid has been acting strangely for the past three weeks

20.     The video reveals that on September 17, 2004 Devon put his head in the toilet at 00:35:03 hours, at 00:39:30 hours; and at 00:41:54 hours. After the first time Devon put his head in the toilet, his skin appears wet.

21.     The toilet contents consisted of urine, feces and toilet paper.

22.    After 00:44:48, Mr. Reid lay still.

23.    At 00:56:18 Defendant Flaherty made a cell check.  Devon was unresponsive to officer Flaherty's shining a flashlight at his eyes.

24.    Officer Flaherty made a second cell check at 01:12:01 to 01:12:20 and again shined his flashlight on Mr. Reid.

25.    After the second check beginning at 01:12:01, Defendant Flaherty contacted the nurse.

26.    Nurse Hehnley enters the cell at 01:15:10 and begins attempts at resuscitation.  The AED system was connected and CPR was initiated.  Shortly thereafter the ambulance personnel arrived, applied the EKG machine, and declared the inmate to be asystolic.

27.    At the time of autopsy, the decedent's body had a "pungent odor of urine on or about the body".  He had toilet paper on his neck, chest, arms, hands, legs, feet, and abdomen, in his hair, on his face and in his nose, with yellow fluid debris around the mouth.  His stomach contained 175 cc of amber fluid with white particles.

28.    The laboratory studies revealed a BUN of 127 and a creatinine of 7.9 mg/dl which is indicative of dehydration and renal failure.  The carboxyhemoglobin measurement of 11% (normal being 4-8%) represents hypoxia.

29.    Defendant Flaherty knew or should have known that Devon Reid had a serious medical need before 00:44 on September 17, 2004 and he acted in conscious disregard of that need.

30.    Defendant Flaherty knew or should have known that Devon Reid had a serious medical need when he checked the cell at 00:56 on September 17, 2004 and he acted in conscious disregard of that need.

- 8 -

31.    As a result of Defendant Flaherty's conscious disregard of Devon Reid's serious medical need, Devon Reid was denied prompt and adequate medical care.

32.    As a result of Defendant Flaherty's conscious disregard of Devon Reid's serious medical need, Devon Reid was caused to experience pain and suffering and died.

33.    Devon Reid's family, specifically his grandmother, Anna Reid, incurred the costs of Devon's funeral in the amount $4,494.00.

B.    Defendant's Version

1.    Reid was singing in his cell when CO Flaherty came on shift at the LCP Medical Housing Unit at approximately 12:00 a.m. on September 17, 2004.

2.    As reflected in the LCP Medical Housing Unit Check Sheet for September 17, 2004, after coming on shift CO Flaherty made random 15-minute checks at approximately 12:10 a.m., 12:24 a.m., and 12:39 a.m.

3.    At approximately 12:45 a.m. on September 17, 2004, Reid suffered massive pulmonary emboli that caused his sudden death as a result of the total blockage of both pulmonary arteries.  Coroner's Report, at LCP 217, 222.

4.    There is no evidence that Reid, who had stopped moving at approximately 12:45 a.m., was alive when CO Flaherty checked on him at 12:56 a.m., and there is no evidence that medical intervention thereafter would have saved his life.

5.    When CO Flaherty checked on Reid at 12:56 a.m., he was not aware that Reid had suffered pulmonary emboli and had a serious medical need.

6.    Given the late night hour and Reid's previous activity of singing loudly, CO Flaherty believed that Reid was simply sleeping.

7.      At his 12:56 a.m. check, CO Flaherty did not believe that Reid was not breathing or had a serious medical need, and as a lay person, had no reason to believe that Reid had a serious medical need based upon his observations.

8.      At approximately 1:12 a.m., CO Flaherty, as part of his check, looked in on Reid again and saw him in the same position on the floor.

9.      CO Flaherty shined his flashlight on Reid and attempted to get Reid's attention by banging on the door.

10.     CO Flaherty immediately returned to his post, contacted the on-call nurse, and also requested the assistance of an auxiliary officer.

11.     At approximately 1:15 a.m. on September 17, 2004, Nurse Hehnley, followed shortly thereafter by CO Flaherty, entered Reid's cell to begin attempts at resuscitation.

12.     The AED system was connected and CPR was initiated.

13.     Shortly thereafter the ambulance personnel arrived, applied the EKG machine, and declared Reid to be asystolic.

C.      Plaintiff's Statement of Damages

As a result of the conduct of Defendant Flaherty, Plaintiff's decedent, Devon Reid, was caused to endure physical pain and suffering, emotional and mental distress and death. Defendant Flaherty's knowing and unnecessary delay in seeking medical treatment caused Devon Reid to be denied medical care that may have saved his life. Devon's family incurred the costs of his funeral in the amount $4,494.00.

## IV.  EXPECTED WITNESSES

    A.    Plaintiff's Witnesses

        1.    Liability

            James Flaherty as on cross - regarding the incident

            Edward Klinovsky - regarding LCP policies and the operation of the LCP camera surveillance system.

            Robert Seimasko - regarding LCP policies and the operation of the LCP camera surveillance system.

        2.    Damages

            Doreen Reid

            Curtis Wood

            Anna Reid

Plaintiff reserves the right to call as a witness any witness identified by Defendant and any experts who have submitted expert reports in this case.  Plaintiff additionally reserves the right to call additional witness to rebut testimony and evidence presented by Defendant.

    B.    Defendants' Witnesses

In addition to the witnesses listed by Plaintiff, Defendants identify the following witnesses who may be called to testify at trial:

        1.    Corrections Officer James Flaherty, LCP: Factual witness regarding the incident.

        2.    Warden Vincent Guarini, LCP; or Deputy Warden Robert Siemasko, LCP Deputy Warden of Treatment Services; or Major Edward Klinovsky, LCP: Factual witness regarding LCP policies and the operation of the LCP camera surveillance system.

        3.    Anna Reid:  Factual witness regarding Plaintiff's alleged damages [by designated portions of her deposition]

Defendants reserve the right to call as a witness any witness identified on Plaintiff's witness list and any of the experts who have submitted expert reports in this case. Defendants additionally reserve the right to call additional witnesses to rebut testimony and evidence presented in Plaintiff's case in chief.

## V.    **EXPECTED EXHIBITS**

### A.    Plaintiff's Exhibits

In addition to the exhibits listed by Defendant, Plaintiff submits the following list of proposed exhibits. In accordance with the Court's Standing Order, two sets of pre-marked and tabbed exhibits in separate three-ring binders will be provided to the Court on the morning of trial:

| | |
|---|---|
| C-1 | CDs: Video of Devon Reid-September 17, 2004 (LCP 0572-0573) |
| C-2 | January 13, 2009 Memorandum, Order and Judgment of Judge Dalzell |
| C-3 | Coroner's Report (LCP 0213-0222) |
| C-4 | MHU Pass-On Book Notes (LCP 0604-0623) |
| C-5 | Medical Pass-on Book Notes (LCP 0593-0603) |
| C-6 | Medical records of Devon Reid (LCP 086-0142) |
| C-7 | Photographs of Cell 1080 |
| C-8 | CV and Report of Robert Greifinger, M.D. |
| C-9 | Suicide Status Policy and Procedure |
| C-10 | Funeral Bills from Scheid Funeral Home and Groff Funeral Home |

### B.    Defendants' Exhibits

In addition to the exhibits listed by Plaintiff, Defendants submit the following list of proposed exhibits. In accordance with the Court's Standing Order, two sets of pre-marked and tabbed exhibits in separate three-ring binders will be provided to the Court on the morning of trial:

| | |
|---|---|
| D-1 | CDs: Video of Devon Reid – September 17, 2004 (LCP 0572-0573) |
| D-2 | January 13, 2009 Memorandum, Order and Judgment of Judge Dalzell |

| | |
|---|---|
| D-3 | Coroner's Report (LCP 0213-0222) |
| D-4 | MHU Pass-On Book Notes (LCP 0604-0623) |
| D-5 | Medical Pass-on Book Notes (LCP 0593-0603) |
| D-6 | Lancaster County Prison Check Sheet dated September 17, 2004 (LCP 0165-0166) |
| D-7 | Lancaster County Prison Block Activity Report (LCP 0163) |
| D-8 | Lancaster County Prison Unusual Activity Report, by James Flaherty, dated September 17, 2004 (LCP 0150-0151) |
| D-9 | June 19, 2008 Expert Report and Curriculum Vitae of Dr. Ronald L. Kotler |
| D-10 | April 24, 2008 Deposition Transcript of Anna Reid |
| D-11 | Funeral Costs of Devon Reid |
| D-12 | Merck Manual Professional edition, Pulmonary Embolism online article |
| D-13 | Penn State Milton S. Hershey Medical Center College of Medicine, Pulmonary Embolism online article |

Defendants reserve the right to supplement this exhibit list and/or present additional exhibits to rebut evidence presented by Plaintiff.

## VI.    UNUSUAL/LEGAL ISSUES

None.

## VII.    MOTIONS *IN LIMINE*

Defendants contend that while Plaintiff can present the expert report of Dr. Robert Greifinger, it does not address the pertinent remaining issues in this case and Dr. Greifinger's opinion should be given no weight due to his lack of qualifications, the lack of reliability of his methodology in arriving at his opinions, and the lack of relevance of his opinions to the remaining issues in this case. A short legal memorandum will be provided regarding this issue.

## VIII. ANTICIPATED LENGTH OF TRIAL

The parties expect trial to last approximately 1 day.

Respectfully submitted,

Kevin C. Allen, Esq.
Crystle, Allen & Braught, LLC
143 North Duke Street
Lancaster, PA 17602

David J. MacMain
Jessica R. Birk
MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA 19109
(215) 772-1500

Attorney for Plaintiff

Date: 2/5/09

Attorneys for Defendant
James Flaherty

Date: 2/5/2009

- 12 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of February, 2009, the foregoing Joint Pretrial

Stipulation was filed electronically and is available for viewing and downloading from the ECF

system.  The following party received electronic service of the Notice of Electronic Case Filing:

Kevin C. Allen, Esq.
Crystle, Allen & Braught, LLC
143 North Duke Street
Lancaster, PA  17602

**Attorney for Plaintiff**

/s/ Jessica R. Birk
Jessica R. Birk